**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. COLIN WRIGHT,<br><br>Plaintiff,<br><br>v.<br><br>CORNELL UNIVERSITY,<br><br>Defendant. | No.  3:26-cv-127 (GTS/ML)<br><br>**COMPLAINT**<br>**FOR COMPENSATORY DAMAGES**<br>**AND INJUNCTIVE RELIEF**<br><br>**Demand for Jury Trial** |

## INTRODUCTION

"Something a Little Out of the Ordinary"

1.      Not long ago, Cornell University sought to fill a highly specialized faculty position in the Department of Ecology & Evolutionary Biology ("Department").

2.      Beyond the usual considerations of competency in the field, Cornell emphasized race as a key consideration for filling this position.

3.      Specifically, it intentionally discriminated against qualified candidates by brazenly refusing to consider white candidates.

4.      Cornell made it clear that it was keen to make a race-based hire that excluded whites.

5.      A Department email from early December 2020 declared that in order to obtain a "diversity hire," it allowed DEI administrators to create an interview list consisting of only "underrepresented minority scholars."

6.      A mid-December Department email further stated that the DEI administrators had "focused especially on identifying candidates from some of the most underrepresented racial/ethnic groups" to create the pool of eligible candidates.

1

7.      Indeed, in a December 23, 2020, email, Department Chairman Jeremy B. Searle ("Searle Email") admitted that Cornell was "trying to do something a little out of the ordinary" in its search for a "hoped-for diversity hire."

8.      The Searle Email emphasized that the job search had been designed to eliminate any competition for this diversity hire: "[The Associate Dean for Diversity and Inclusion] is concerned about us having a Search dynamic. What we should be doing is inviting one person whom we have identified as being somebody that we would like to join our department and *not have that person in competition with other*s." (emphasis added).

9.      Most damningly, internal records confirm that Cornell was fully committed to this anti-white hiring program; faculty received emails that contained a "smoking gun" spreadsheet that detailed how applicants satisfied a "diversity axis" qualification.

10.     Of the top 25 candidates, all were listed as either black, Latina, LGBTQ, disability, American Indian, or Southeast Asian; not a single one had "white" listed by his or her name—and this was by design.

11.     To ensure that no whites would interfere with the "diversity axis," Cornell intentionally kept the faculty job opening private, in violation of University Policy 6.6.1, which requires vacancies to be posted on the *Working at Cornell* website for at least five business days.

12.     If the first "diversity hire" applicant were not interested in the position, the Searle Email stated that Cornell would simply move on to the next "diverse" candidate. No other applicants were solicited, permitted to apply, or even informed of the open faculty position.

13.     To ensure that this hiring process remained secret and hidden from white qualified applicants, Cornell faculty instructed its staff—in bold, underlined font—to "keep all materials confidential."

14.    Cornell's pursuit of an unlawful "diversity axis" meant that highly qualified applicants who, like the Plaintiff, Dr. Colin Wright, are white, were not only unable to apply, but also were unaware that they had even been subjected to Cornell's anti-white blacklist.

15.    Dr. Wright is an evolutionary biologist who was eminently qualified for Cornell's open faculty position. He is one of very few academics in America who was both a specialist in this highly specialized field and actively seeking employment as a tenured professor at the time of the vacancy at Cornell. At the time, he had authored 25 peer-reviewed scientific publications and was serving as an Eberly Postdoctoral Research Fellow at Pennsylvania State University.

16.    Had Cornell's "out of the ordinary" recruiting process not been revolving around a "diversity axis" and been kept secret, Dr. Wright would have applied and is precisely the type of highly qualified applicant that Cornell should have considered.

17.    Dr. Wright received his Notice of Right to Sue from the Equal Employment Opportunity Commission on January 23, 2026, and files this lawsuit to vindicate his civil rights and ensure that Cornell complies with all federal and state employment laws.

## PARTIES

18.    Plaintiff, Dr. Colin Wright ("Plaintiff" or "Dr. Wright"), is a natural person residing in the State of Tennessee, who received his Ph.D. in Evolution, Ecology, and Marine Biology in 2018.

19.    Defendant, Cornell University ("Cornell," "Cornell University," of "Defendant"), is an educational, nonprofit corporation organized and existing under the laws of New York and with its principal place of business located in Ithaca, New York.

3

## JURISDICTION AND VENUE

20.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

21.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the Defendant resides in this district and because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district.

22.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same operative facts as Plaintiff's federal discrimination claims.

23.     This Court has the authority to award the requested injunctive relief and damages under 28 U.S.C. § 1343(a), declaratory relief under 28 U.S.C. § 2201, and other relief requested under 28 U.S.C. § 2202. It has authority to award attorneys' fees and costs under 42 U.S.C. § 2000e-5(k) and N.Y. Exec. Law § 297(10). And it has authority to award punitive damages under 42 U.S.C. § 1981a, N.Y. Exec. Law § 297(9) and (4)(c), and any other applicable source of law.

## FACTS

### I.      The Vacancy at the Department of Ecology and Evolutionary Biology:

24.     The Department of Ecology and Evolutionary Biology at Cornell is a highly specialized department, comprising only roughly 30 faculty members in a university with more

than 3,000 professorial faculty members.[1]

25.    Nationwide, the field of ecology and evolutionary biology is highly specialized, with only a tiny fraction of academics participating in the field.

26.    According to the National Center for Science and Engineering Statistics, only roughly one percent of research doctorate recipients in America receives their degree in Ecology or Evolutionary Biology.[2]

27.    Of that one percent, an even smaller number is qualified to conduct research and teach at a selective university like Cornell.

28.    In December 2020, Dr. Wright was one of the very small number of people in the world who was qualified to be hired for a tenure-track position in the Cornell Department of Ecology and Evolutionary Biology.

29.    As set forth in more detail below, Dr. Wright was exactly the type of candidate that Cornell should have considered given his academic training and scholarly research.

30.    But for Cornell's violation of its own policies as set forth below, Dr. Wright would have applied for the vacant position.

31.    But for Cornell's violation of its own policies, Dr. Wright, given his qualifications, would have been hired for the position.

## II.    Official Cornell Hiring Policies:

32.    During the operative time of this action, Cornell publicly stated that it did not

---

[1] Compare https://ecologyandevolution.cornell.edu/faculty (Last accessed Jan. 22, 2026) with https://hr.cornell.edu/sites/default/files/2022-12/this_is_cornell.pdf#:~:text=Founding%20and%20Identity%20Cornell%20employs%20some%208%2C100,1%2C700%20faculty%20members%20at%20Weill%20Cornell%20Medicine. (Last accessed Jan. 22, 2026).
[2] See https://ncses.nsf.gov/pubs/nsf25349/assets/nsf25349.pdf at 13, 70 (subtracting epidemiology doctorates) (Last accessed Jan. 22, 2026).

discriminate based on race, color, or national origin.[3]

33.     Cornell professed adherence to "applicable federal, state, or local law[s]" regarding discrimination.[4]

34.     Cornell's public statements on diversity emphasized having minorities apply for employment: *"Cornell University embraces diversity and seeks candidates who will contribute to a climate that supports students, faculty, and staff to all identities and backgrounds. We strongly encourage individuals from underrepresented and/or marginalized identities to apply."* [5]

35.     During this time frame, Cornell's official policy was to post open positions on its website for all to see and for all to apply for, regardless of race, color, or national origin.

36.     Cornell's Guidelines to Support Filling Vacancies on Posting and Advertising declares, "Positions posted on the Jobs site are automatically listed with NYS Job Bank, HERC, HigherEdJobs.com, and the local Department of Labor Office in order to comply with state and federal regulations."[6]

37.     According to Cornell University Policy 6.6.1, faculty openings like this one "must be posted on the *Working at Cornell* website for at least five business days. To advance the university's philosophy, it is strongly recommended that the time span of the postings be of a duration that allows for the development of a robust applicant pool. To comply with state and federal regulations, Cornell distributes to external websites all positions posted on the *Working at*

---

[3] https://web.archive.org/web/20241229020839/https:/hr.cornell.edu/about/workplace-rights/equal-education-and-employment-opportunity-statement (Captured Feb. 14, 2023 – Jan. 13, 2026).
[4] *Id*.
[5] *Id*.
[6] https://hr.cornell.edu/about/employment-policy-practice/employment-policies/guidelines-support-filling-vacancies (Last accessed Jan. 22, 2026).

*Cornell* website."[7]

38.    Pursuant to its own policies, Cornell University was required to publicly post the vacant Department of Ecology and Evolutionary Biology position to the *Working at Cornell* website. But it intentionally failed to do so to discriminate against qualified white candidates like Dr. Wright and prevent them from competing against those on Cornell's exclusive list of "diverse" candidates.

### III.    Cornell's Illegal Diversity Hire:

39.    Cornell blatantly violated its own hiring policies by using a "diversity axis" to determine its search for the vacant Department of Ecology and Evolutionary Biology position.

40.    Internal emails and spreadsheets reveal that Cornell University administrators acted to ensure the selection of an individual from an underrepresented racial or ethnic group for the tenure-track faculty position.

41.    On information and belief, an early December 2020 email to the Department stated, in pertinent part, that "because this is the season for job searches …underrepresented minority scholars will be looking for jobs" and that Cornell's diversity team had "worked hard to come up with a list of postdocs and assistant professors with diverse backgrounds that we should discuss as possibilities for a departmental hiring bid."

42.    This same email advised that the Cornell diversity team would "present their list of minority postdocs and assistant professors, also for discussion" and the author acknowledged that "there is a department-wide desire to increase the diversity of our faculty."

43.    On information and belief, in mid-December a Department email was circulated

---

[7] https://policy.cornell.edu/policy-library/filling-vacancies-excluding-bargaining-unit-staff (Last accessed Jan. 22, 2026).

stating, in pertinent part, "it is evident that as a group we strongly wish to press for a diversity hire for EEB in the current job cycle" and that "we should use the list of diversity candidates created by the … [diversity team] as the starting point for selection of suitable individuals for interview" and that "If I hear that a particular candidate does not wish to interview, I will select the fourth candidate in the list, and so on down the list for any other cases of declined interview."

44.    This email went on to state that Cornell was working with "people who are particularly engaged in diversity issues, and … [l]ooking at websites and listservs focused on diversity (e.g., Diversify EEB, listservs for Black researchers in biology)." The email further stated that Cornell "focused especially on identifying candidates from some of the most underrepresented racial/ethnic groups, based on a sense from the department that there is an urgent need for better representation along this axis, but many of the candidates also represent other axes of diversity (first gen, LGBTQIA+, gender, nationality)."

45.    A copy of the spreadsheet described in the mid-December email mentioned both a "'long list' of 25 people [which] included all of the nominations from EEB faculty members" and the "7 'Highest Interest' candidates".

46.    The spreadsheet identifies 25 candidates who were considered for the vacant, tenure-track position in the Department of Ecology and Evolutionary Biology, seven (7) of whom were identified as "Highest Interest" candidates.

47.    Shockingly, the spreadsheet contains a column titled "Diversity Axis," in which the race and ethnicity of every candidate is disclosed.

48.    Fourteen of the 25 candidates are listed as "Black." One is listed as "Black, Disability." One is listed as "Black, Latina." One is listed as "Latina Black." Five of the 25 candidates are listed as "Latina." One is listed as "Latina, American Indian." One is listed as

"Latina LGBTQ." And one is listed as "Southeast Asian."

49.    In total, 24 of the 25 candidates are listed as "Black" or "Latina" and 7 of the 7

highest interest candidates are listed as "Black" or "Latina."

50.    The Searle Email, sent on December 23, 2020, updated the Department on the

search and stated in pertinent part (emphasis in italics):

> Dear all,
>
> **CONFIDENTIAL**
>
> I have been having extensive e-mail and verbal discussions with Chelsea Specht, CALS Associate Dean for Diversity and Inclusion, and Yael Levitte, Associate Vice Provost and Avery August, Vice Provost in the Office of Faculty Development and Diversity, ***about our hoped-for diversity hire***. I think the discussions have been going well. I feel that because of their expertise, and because ***we are trying to do something a little out of the ordinary***, I am wanting to follow their advice closely. What follows and what is attached reflects that.
>
> Chelsea feels that the best [sic] is to ***invite just one person***. She is concerned about us having a Search dynamic. What we should be doing is ***inviting one person*** whom we have identified as being somebody that we would like to join our department and ***not have that person in competition with others***. If that person is interested in the possibility of joining EEB, we would invite them for interview and we obviously would hope that would lead to a hiring. However either side might decide not to continue if, through the process, the fit does not seem to be right.
>
> So, the plan would be to invite Celina Baines, who is clearly our top candidate among those that we have been comparing. If Celina is not interested, then we would move on to Swanne Gordon, and so on.
>
> [going on:]
>
> Unless I hear objections, I'll write to Celina tomorrow – and keep everyone informed on how the process goes.
>
> One of the bright spots in a very difficult year has been the tremendous commitment that EEB has been showing towards diversity and inclusion, and I want to thank you all for your enthusiasm for this hiring initiative.
>
> **<u>As always when named individuals are being considered in a hiring context, please keep all materials confidential</u>**

51.     Cornell's hiring process for this faculty position, as designed, implemented, and described in writing by DEI administrators and Chairman Searle, was patently discriminatory and an effective blacklist against qualified white applicants.

52.     The vacancy listing was flawed and unlawful from the very start, as it was designed by DEI administrators seeking to maximize the ability of applicants to strictly fill the "diversity axis," free of competition from white candidates.

53.     For whites, the process for competing to be hired by the Department of Ecology and Evolutionary Biology was over before it started, as they had been placed on Cornell's blacklist.

54.     This included Dr. Wright, who could not be considered for—or even notified of—the position for which he was uniquely qualified—all because he was white.

55.     Cornell devoted substantial resources towards satisfying its search for a "diversity hire."

56.     The initial list of candidates was not created by the Department, but, as stated in the early December email, by "the DEIJB [Diversity, Equity, Inclusion, Justice, and Belonging] working group on hiring [who] worked hard to come up with a list of postdocs and assistant professors with diverse backgrounds that [the department] should discuss as possibilities for a departmental hiring bid."

57.     The mid-December email advised that they were joined in this effort on the "DEI faculty hiring sub-committee" by "postdocs Conor Taff and Sabrina McNew."

58.     The Searle Email advised that Chairman Searle was working with Associate Dean for Diversity and Inclusion Yale Levitt and Vice Provost in the Office of Faculty Development and Diversity Avery August and would "follow their advice closely."

59.     The very mission of the Office of Faculty Development and Diversity is to work with deans, chairs, and search committees to improve recruitment and retention practices and to increase diversity in faculty hiring.

60.     After the list was presented to departmental faculty to finally ask for their input, it was made clear that any additions to the list must conform to the desired outcome to hire someone who was "Black" or "Latina."

61.     The mid-December email stated that if a faculty member wanted to add someone to the list they must "provide the same level of detail about the candidates as for the current 7," warning that it "is important to read the account below [from the DEI hiring working group] before adding new names to the short list[.]"

62.     The author then advised: "If there are any aspects of this process that you don't understand or are uncomfortable with, please contact me."

63.     After the creation of a list of seven names that had already eliminated every potential candidate for the job except for those that were "Black" or "Latina," the group went on to ensure that no competition from white candidates could occur.

64.     Cornell eventually hired one of the pre-selected candidates on the "diversity axis" to fill the vacant faculty position in the Department. At the time, Dr. Wright had no idea either that the position had been open or that it had been filled because the entire process was deliberately concealed from the public, contrary to Cornell employment practices and policies, to avoid competition from qualified candidates who were white.

65.     The special efforts Cornell took in its self-proclaimed search for a "diversity hire"—the decision not to publicly list the position, the requests for confidentiality, passing over white candidates to secure candidates who satisfied the "diversity axis," and, of course, the

recognition that all of this was "out of the ordinary"—removes any doubt that Cornell fully blessed this intentionally discriminatory recruiting effort, and did so knowing that it not only violated Cornell's policies, but federal and state employment laws.

## IV.    Dr. Wright's Qualifications and Exclusion from Consideration:

66.    Based on his impeccable and highly relevant credentials for the open faculty position, Dr. Wright should have been hired—or at the very least, considered.

67.    Ecology and Evolutionary Biology is Dr. Wright's very specialty in which he received his Ph.D. and in which he was working and searching for jobs in 2020-2021.

68.    Dr. Wright obtained his Ph.D. in 2018 from the University of California at Santa Barbara (UCSB), which is ranked among the top 50 universities in the United States and for biological sciences, and 12th in Ecology/Evolutionary Biology.[8]

69.    But Swanne Gordon, who was ultimately hired for the position, received her Ph.D. from the University of California Riverside, which is ranked 74th in Biological Sciences, lower than where Dr. Wright received his doctorate.

70.    In addition, while in graduate school, Dr. Wright was accepted into the National Science Foundation (NSF) Graduate Research Fellowship Program, which is an extremely competitive and prestigious fellowship for "outstanding graduate students."[9]

71.    By December 2020, Dr. Wright had published 25 scholarly, peer-reviewed research papers in the field of evolutionary biology and held a prestigious, professional academic position in the same field at Pennsylvania State University, a highly competitive research

---

[8] University of California--Santa Barbara - Overall Rankings, https://www.usnews.com/best-graduate-schools/university-of-california-santa-barbara-110705/overall-rankings (Last accessed Jan. 22, 2026).
[9] https://www.nsfgrfp.org/ (Last accessed Jan. 23, 2026).

university.

72.    The h-index is a widely used, objective metric of scholarly impact that measures both the productivity and influence of an academic's published work. A scholar has an h-index of *h* when *h* of their publications have each been cited at least *h* times by other researchers. The metric is designed to reflect sustained academic influence, rather than isolated or one-off publications, and is commonly relied upon in faculty hiring, promotion, and tenure decisions across research universities.

73.    Cornell University claims to strongly weigh an applicant's h-index, relevant postdoctoral experience, and the educational institutions an applicant received his or her Ph.D. from when considering the applicant for a faculty position.

74.    According to Google scholar, Celina Baines, the "top candidate" for the job, according to the "diversity axis" spreadsheet, had an h-index in 2020 of only 4.

75.    As of 2020, Dr. Wright's h-index was 10, two and a half times higher than Baines'.

76.    Also, Dr. Wright had more than twice as many peer-reviewed publications as Baines—25 versus 11—and had been cited more than three times as many times as she—220 versus 73.

77.    Among other candidates listed on the infamous spreadsheet as "Highest Interest" are:

- Dr. Graziella DiRenzo: possessing post doctorate experience at Penn State University (same as Dr. Wright), a Ph.D. at University of Maryland, College Park (ranked #68 in biological sciences), with 23 published research papers as of 2020 found on Google Scholar. She is listed in the spreadsheet as "Latina."

- Maria Rebolleda-Gomez: possessing post doctorate experience at the University of Pittsburg, with only 14 published research papers prior to 2020, and a Ph.D. from the University of Minnesota; and she is identified as *both* "Latina" *and* "LGBTQ."

78. Two of the individuals Cornell was interested in hiring even had similar post doctorial experience to that of Dr. Wright—at Penn State University. But Dr. Wright's position as an Eberly Postdoctoral Research Fellow was an even more prestigious and competitive position at Penn State, as it was a departmental position reserved for "exceptional early-career scientists."[10]

79. Among the Universities where the "Highest Interest" candidates received their Ph.D. is the University of California, Riverside (ranked #74 by US News in biological sciences grad schools) and the University of Maryland (#68), both of which are ranked lower for their doctoral programs in biology than Dr. Wright's alma matter, UC Santa Barbara (#50 in biological sciences, #12 in evolutionary biology).

80. Dr. Wright's credentials exceeded those of all seven candidates considered on the "Highest Interest" list, including Dr. Gordon, who was ultimately hired for the position. Dr. Wright was plainly qualified for this position yet barred from even applying.

81. Indeed, upon information and belief, there is no reason Dr. Wright would not have been hired for the position but for Cornell University's discriminatory practices and intentional violation of its own policies.

82. Dr. Wright received his Ph.D. from a higher-ranked school, had received a highly competitive NSF fellowship, had contributed more to research in the fields of evolution and

---

[10] https://science.psu.edu/postdoc (Last accessed Jan. 23, 2026).

ecology, and was selected for a competitive postdoctoral position. However, Dr. Wright, because he was white, was categorically blacklisted from applying to Cornell University's open faculty position in Evolutionary Biology. In addition, Dr. Wright was looking for a tenure-track position at the time.

83.    From the time he received his Ph.D. in 2018 until 2021, Dr. Wright actively sought employment in academia at colleges and universities across the country in the field of biology, especially evolutionary biology and ecology.

## V.    Dr. Wright Learns of the Cornell Faculty Position and Lost Opportunity:

84.    Dr. Wright first learned of the open faculty position on June 26, 2025, when he read a post on X by Christopher Rufo about a whistleblower email that contained an image of the Searle Email and Cornell's "out of the ordinary" search for a "diverse" applicant.[11]

85.    Thirty-two days later, on July 28, 2025, Dr. Wright submitted a Title VII Discrimination Charge against Cornell to the Equal Employment Opportunity Commission (EEOC), attached as **Exhibit 1**.

86.    With Dr. Wright's EEOC Charge pending, Cornell University entered into a settlement agreement with the United States on November 7, 2025, in which it "affirm[ed] its commitment to complying with federal civil rights laws and agree[d] to include the Department of Justice's 'Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination' of July 29, 2025 as a training resource to faculty and staff so long as that Guidance remains operative."[12]

87.    The DOJ Guidance declared it unlawful to do exactly what Cornell did to Dr.

---

[11] https://x.com/SwipeWright/status/1938373902599647257?s=20 (Last accessed Jan. 22, 2026).
[12] https://statements.cornell.edu/2025/documents/cornell-settlement-agreement.pdf (Last accessed Jan. 23, 2026) at  2, ¶ 6.

Wright, giving the following example of an unlawful practice:

> Preferential Hiring or Promotion Practices: A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.[13]

88.     By agreeing to use the DOJ Guidance to train its faculty and staff, Cornell has made an admission that preferential hiring or promotion practices violate federal discrimination laws.

89.     While Cornell claims to have taken steps to end its discriminatory practices at the behest of the federal government, the damage to Dr. Wright's career is done.

90.     As a result of Cornell's discrimination against Dr. Wright, he suffered the loss of a faculty position at Cornell which would have been the culmination of twelve years of academic research and work.

91.     As a result of not being allowed to apply to and accept the vacant position, Dr. Wright's career progression was stunted.

92.     With university affiliation and support, Dr. Wright produced an average of over three scholarly, peer-reviewed articles per year, including eight in 2019; whereas, without university affiliation, he produced only three in six years.

93.     The loss of salary that Dr. Wright would have earned at Cornell, alone, constitutes at least $700,000 as of today, which would amount to tens of thousands of dollars less than he has made in other roles since then.

94.     Dr. Wright also suffered lost future wages that he would have earned in the position. He would have received an earnings boost for receiving tenure. And he could have used

---

[13] https://www.justice.gov/ag/media/1409486/dl (July 29, 2025).

the post to negotiate a new position at a higher salary at another university.

95.     In addition, Cornell's discrimination caused Dr. Wright reputational harm. Had he received the tenure-track faculty position at Cornell, he would have received all the prestige that comes with serving as a professor at an Ivy League university. He would have received a great deal of professional respect, both for his position and also for his research.

96.     Instead, he was forced to publish some of his research work without a university affiliation.

97.     Research published without a university affiliation is often considered suspect; contrariwise, scholarship conducted with university affiliation has an easier path to securing federal funding.

98.     Dr. Wright also suffered emotional harm from Cornell's discrimination. The time period in which Cornell was blacklisting him from applying for his dream job was the most stressful and anxiety-inducing time of his life.

99.     On January 26, 2026, the EEOC issued Dr. Wright a Notice of Right to Sue under Title VII from the EEOC, attached as **Exhibit 2**. One hundred eighty days have expired since Dr. Wright filed his EEOC discrimination charge.

100.     Dr. Wright now seeks to vindicate his civil rights and ensure that Cornell complies with all federal and state employment laws.


## **CLAIMS FOR RELIEF**

### **CLAIM I: TITLE VII § 703(a)(2)**

101.     Cornell University violated Title VII of the Civil Rights Act of 1964 § 703(a)(2) (42 U.S.C. § 2000e-2(a)(2)) by committing employment discrimination on the basis of race,

color, and national origin.

102.    Plaintiff realleges the allegations in the preceding paragraphs of this Complaint and incorporates them by reference.

103.    Title VII of the Civil Rights Act of 1964 § 703(a)(2) declares that it is "an unlawful employment practice for an employer . . . to limit, segregate, or classify . . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).

104.    Cornell is an "employer" in the United States of America and is subject to Title VII of the Civil Rights Act of 1964 because, at all times relevant, it employed more than fifteen employees, including faculty and administrative personnel, and was engaged in an industry affecting interstate commerce.

105.    Dr. Wright is a white male, and Title VII protects him and his class from discrimination based on his race, color, sex, and national origin.

106.    From 2020 to 2022, Cornell University sought to hire a new faculty member for a tenure-track position within the Department of Ecology & Evolutionary Biology.

107.    Cornell University departed from its usual course of hiring by hiding this job opening from the public and offering the position only to individuals based on their race. To do so, Cornell limited, segregated, and classified applicants for employment based on race and created a list of "diverse" candidates to whom it offered employment one at a time. Candidates that were not of the preferred race, color, or national origin, namely white people like Dr. Wright, were systemically excluded from consideration.

108.    Thus, Cornell intentionally discriminated against Dr. Wright and other whites and

most Asians based on their race, color, and national origin. Cornell University openly referred to those it wanted to hire as members of "underrepresented racial/ethnic groups," explicitly communicating that the individual would be hired based on his or her status as a minority race and/or ethnicity.

109.    Cornell acted with malice or, at least, with reckless indifference to Dr. Wright's federally protected rights by intentionally excluding members of his race, color, and national origin from consideration for the position.

110.    Cornell's process of limiting, segregating, and classifying applicants for the Department of Ecology & Evolutionary Biology professorship based on race and ethnicity deprived or tended to deprive Dr. Wright of the employment opportunities to apply for, receive consideration for, and receive employment for the professorship—based on his race, color, and national origin.

### CLAIM II: TITLE VII § 703(a)(1)

111.    Cornell University violated Title VII of the Civil Rights Act of 1964 § 703(a)(1) (42 U.S.C. § 2000e-2(a)(1)) by committing employment discrimination on the basis of race, color, and national origin.

112.    Plaintiff realleges the allegations in the preceding paragraphs of this Complaint and incorporates them by reference.

113.    Title VII of the Civil Rights Act of 1964 § 703(a)(1) declares that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . an individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

114.    "The complainant in a Title VII trial must carry the initial burden under the statute

of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

115.    "[T]he standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025).

116.    Dr. Wright possessed the relevant academic expertise to qualify for a tenure-track position within the Department of Ecology & Evolutionary Biology at Cornell University in 2020-2022.

117.    Also, Dr. Wright was actively seeking employment in this specific field of academia and had submitted an application to Cornell University and applications to several other colleges and universities like Cornell for similar roles from 2018 to 2021.

118.    But Cornell's hiring scheme, which explicitly discriminated against him based on race, color, and national origin by hiding the job opening from him and not subjecting other applicants to fair competition, prohibited Dr. Wright from applying for the open position.

119.    Dr. Wright would have applied for the open tenure-track position within the Department of Ecology & Evolutionary Biology at Cornell University in 2020-2021 but for Cornell's intentionally discriminatory act to hide the position from him because he was not the university's preferred race, color, or national origin.

120.    Dr. Wright would have accepted the position if offered.

121.    After Dr. Wright was initially rejected from the "diversity" candidate list, based on race, the position remained open, and Cornell continued to seek applicants from persons of Dr. Wright's qualifications or less whose race and ethnicity were those preferred by Cornell.

122.    Thus, Cornell University's employment practice discriminated against Dr. Wright by refusing to hire—or even consider or allow to apply—individuals such as himself on the bases of race, color, and/or national origin.

### CLAIM III: New York State Human Rights Law § 296(1)(d)

123.    Cornell University violated the New York State Human Rights Law § 296(1)(d) by circulating a statement and using a form of employment application that discriminated on the basis of race, color, and national origin.

124.    Plaintiff realleges the allegations in the preceding paragraphs of this Complaint and incorporates them by reference.

125.    Cornell University is an "employer" within the meaning of N.Y. Exec. Law § 292(5) and is subject to the New York State Human Rights Law.

126.    Under New York State Human Rights Law § 296(1)(d), it is "an unlawful discriminatory practice" "For any employer . . . to . . . circulate or cause to be . . . circulated any statement, . . . or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to . . . race, . . . color, national origin, . . . or any intent to make any such limitation, specification or discrimination, unless based upon a bona fide occupational qualification . . . ." N.Y. Exec. Law § 296(1)(d).

127.    Cornell University circulated statements in the form of emails explaining that it was expressing discrimination in the hiring of its tenure-track position within the Department of

Ecology & Evolutionary Biology in 2020-2022 by limiting the position to a predetermined "diversity" list of potential applicants based on race, color, national origin, sexual orientation, and gender identity or expression.

128.    By creating the "diversity" list, Cornell University utilized a form of application for employment that discriminated based on race, color, and national origin.

129.    Race, color, and national origin were not bona fide occupational qualifications for the tenure-track position within the Department of Ecology & Evolutionary Biology hired in 2020-2022.

130.    A broad interpretation of the New York State Human Rights Law is appropriate when considering its application since "the very purpose of the Human Rights Law was . . . to eliminate all forms of discrimination, those then existing as well as any later devised." *Hispanic Aids Forum v. Est. of Bruno*, 792 N.Y.S.2d 43, 50 (N.Y. App. Div. 1st Dept. 2005) (SAXE, J.P., dissenting) (quoting *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Bd.,* 41 N.Y.2d 84, 89, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976)).

131.    Furthermore, N.Y. Exec. Law § 300 explicitly directs that the New York State Human Rights Law be liberally construed to accomplish its remedial purposes. *See also Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024). The statute further provides that "exemptions from" the law "shall be construed narrowly in order to maximize deterrence of discriminatory conduct." N.Y. Exec. Law § 300.

132.    Therefore, Cornell University violated New York State Human Rights Law § 296(1)(d) (N.Y. Exec. Law § 296(1)(d)).

### CLAIM IV: New York State Human Rights Law § 296(1)(a)

133.    Cornell University violated the New York State Human Rights Law § 296(1)(a)

by barring Dr. Wright from employment because of his race, color, and national origin.

134.    Plaintiff realleges the allegations in the preceding paragraphs of this Complaint and incorporates them by reference.

135.    Under New York State Human Rights Law § 296(1)(a), it is "an unlawful discriminatory practice" "For an employer . . . because of an individual's . . . race, . . . color, [or] national origin . . . to refuse to hire or employ or to bar . . . from employment such individual . . . ." N.Y. Exec. Law § 296(1)(a).

136.    Dr. Wright was at all relevant times a member of a protected class, based on his race, color, and national origin as a white man from the United States of America.

137.    Dr. Wright possessed the relevant academic expertise to qualify for a tenure-track position within the Department of Ecology & Evolutionary Biology at Cornell University in 2020-2021.

138.    Also, Dr. Wright was actively seeking employment in this specific field of academia and had submitted applications to several colleges and universities like Cornell University for similar roles from 2018 to 2021.

139.    But Cornell's hiring scheme, which explicitly discriminated against him based on race, color, and national origin by hiding the job opening from him and not subjecting other applicants to fair competition, prohibited Dr. Wright from applying for the open position.

140.    Cornell barred Dr. Wright from employment in the Department of Ecology & Evolutionary Biology and refused to hire him by creating an illegal "diversity" list that discriminated against Dr. Wright by excluding him and others from the list of potential applicants because of his race, color, and national origin.

141.    Dr. Wright would have applied for the open tenure-track position within the

Department of Ecology & Evolutionary Biology at Cornell University in 2020-2021 but for Cornell's intentionally discriminatory act to hide the position from him because he was not the university's preferred race or ethnicity.

142.    Dr. Wright would have accepted the position if offered.

143.    Thus, Cornell University's employment practice discriminated against Dr. Wright by barring him from being allowed to apply, being considered, and being hired because of his race, color, and national origin.

144.    Therefore, Cornell University violated New York State Human Rights Law § 296(1)(a) (N.Y. Exec. Law § 296(1)(a)).

**CLAIM V: New York State Human Rights Law § 296(13)**

145.    Cornell University violated the New York State Human Rights Law § 296(13) by blacklisting Dr. Wright and others from employment, based on race, color, and national origin.

146.    Plaintiff realleges the allegations in the preceding paragraphs of this Complaint and incorporates them by reference.

147.    Under New York State Human Rights Law § 296(13), "It shall be an unlawful discriminatory practice (i) for any person to . . . blacklist, or to . . . discriminate against any person, because of the race, . . . color, [or] national origin, . . . or (ii) for any person wilfully to do any act or refrain from doing any act which enables any such person to take such action." N.Y. Exec. Law § 296(13).

148.    The "diversity" list that Cornell created and utilized to hire the tenure-track position within the Department of Ecology & Evolutionary Biology at Cornell University in 2020-2022 blacklisted whole classes of potential employees like Dr. Wright because they were not the preferred race or ethnicity.

149.    Dr. Wright possessed the relevant academic expertise to qualify for the tenure-track position within the Department of Ecology & Evolutionary Biology at Cornell University in 2020-2021.

150.    Had he not been banned from applying for the position because of his race, color, and national origin, Dr. Wright would have done so and would have accepted the job if offered.

151.    Because Cornell blacklisted white people from being allowed to apply, being considered for employment, and being hired for the position, it violated New York State Human Rights Law § 296(13) (N.Y. Exec. Law § 296(13)).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A.    Declare that the Cornell University employment practice of secretly comparing potential job applicants based on race, identifying and offering an interview only to candidates of certain races and ethnicities, excluding others from the job application process, and then offering the job position only to candidates of certain races and ethnicities violates Title VII and the New York State Human Rights Law;

B.    Enjoin Cornell University from engaging in the employment practice of secretly comparing potential job applicants based on race, identifying and offering an interview only to candidates of certain races and ethnicities, excluding others from the job application process, and then offering the job position only to candidates of certain races and ethnicities because such action violates Title VII and the New York State Human Rights Law;

C.    Enjoin Cornell University by requiring it to take down from its website, and to remove from its policies and procedures, any and all language which violates federal and New York state discrimination laws;

D.      Award Plaintiff nominal damages;

E.      Award Plaintiff compensatory damages for emotional suffering from discrimination, reputational harm, loss of employment, back pay, front pay, and lost future wages;

F.      Award Plaintiff punitive damages, pursuant to 42 U.S.C. § 1981a and N.Y. Exec. Law § 297(9) and (4)(c);

G.      Award Plaintiff attorneys' fees and costs, pursuant to 20 U.S.C. § 2000e-5(k) and N.Y. Exec. Law § 297(10);

H.      And such other relief as the Court deems just and proper.

Dated: January 26, 2026                        Respectfully submitted,

s/ Chester Ostrowski

Chester Ostrowski, NY Bar No. 519152
Mark Luccarelli, *Pro hac vice forthcoming*
McLaughlin & Stern, LLP
1122 Franklin Ave., Suite 300
Garden City, New York 11530
Telephone: (516) 829-6900
costrowski@mclaughlinstern.com
mluccarelli@mclaughlinstern.com

and

Richard Lawson, *Pro hac vice forthcoming*
Andrew Zimmitti, *Pro hac vice forthcoming*
Jack Casali, *Pro hac vice forthcoming*
America First Policy Institute
1455 Pennsylvania Ave., N.W., Suite 225
Washington, D.C. 20004
Telephone: (703) 637-3690
rlawson@americafirstpolicy.com
azimmitti@americafirstpolicy.com
loneill@americafirstpolicy.com
jcasali@americafirstpolicy.com

*Attorneys for Plaintiff*