# Exhibit 1

July 28, 2025

Stephanie Littlehale
U.S. Equal Employment Opportunity Commission
Buffalo Local Office
300 Pearl Street, Suite 450
Buffalo, NY 14202

*Sent via email and online portal*

Dear Ms. Littlehale,

We write on behalf of our client, Dr. Colin Wright, to file a new charge of discrimination against Cornell University under Title VII of the Civil Rights Act of 1964. This charge arises from new and disturbing facts that have recently come to light and warrant independent investigation by the Equal Employment Opportunity Commission. We respectfully request that the EEOC open a new investigation into Cornell's conduct as it pertains to Dr. Wright, and consider this charge as part of the Commission's broader inquiry into systemic discrimination at the University.

As detailed in the enclosed narrative, Dr. Wright is a highly qualified evolutionary biologist who earned his Ph.D. in Evolution, Ecology, and Marine Biology from the University of California, Santa Barbara, and completed a postdoctoral fellowship at Penn State in 2020. At the time, he was actively applying for faculty positions in his field—including those at top-tier institutions like Cornell.

An internal email recently obtained by AFPI and now made public reveals that between 2020 and 2022, Cornell University implemented a covert hiring scheme that excluded qualified candidates like Dr. Wright on the basis of race. University officials conspired to bypass open competition by reserving at least one faculty position in Ecology and Evolutionary Biology for a predetermined "diversity hire"—as defined by race—without posting the job publicly. Dr. Wright, whose credentials and publication record made him an ideal candidate for such a position, was systematically denied any opportunity to apply because the opening was concealed and restricted to applicants with University-preferred immutable characteristics.

The email in question underscores both intent and concealment. Administrators intentionally engaged in a process they admit was "a little out of the ordinary" by identifying preferred candidates and inviting them—one at a time—to apply, without any public posting, competition, or transparency. They also repeatedly emphasized the need for secrecy, acknowledging the potential legal exposure of their actions.

Because the position in question was never publicly posted—despite Cornell's own hiring policies requiring otherwise—Dr. Wright had no knowledge that the job existed, let alone that he had been excluded from consideration due to his race. It was only through AFPI's investigation and the release of internal documents that he became aware

of the discrimination. We believe this constitutes grounds for equitable tolling of the applicable time limits under Title VII, as recognized by courts in the Second Circuit.

Dr. Wright's case is emblematic of the broader pattern of systemic, race-based hiring discrimination currently under investigation at Cornell. However, the direct and individualized harm to Dr. Wright—who was effectively shut out of his chosen profession—demands focused attention and accountability.

We respectfully request that the EEOC open a new charge and initiate a formal investigation into Cornell University's discriminatory conduct with respect to Dr. Wright. Please do not hesitate to contact us if any additional information is required.

Sincerely,

*Jessica Hart Steinmann*
Jessica Hart Steinmann
Executive General Counsel
America First Policy Institute

*Leigh Ann O'Neill*
Leigh Ann O'Neill
Chief of Staff, Center for Litigation; Senior Legal Strategy Attorney
America First Policy Institute

Enclosure:    Narrative Statement of Colin Wright, PhD

*Statement of Colin Wright, PhD*

On June 26th 2025, the America First Policy Institute (AFPI) filed a Civil Rights Complaint against Cornell University for systemic discrimination. That complaint included internal Cornell University emails exposing not just racially discriminatory hiring practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), but the lengths to which Cornell University went to hide their conduct so that otherwise qualified individuals, such as myself, would be unaware that their rights were violated. Simultaneously with AFPI's complaint, a news story featuring unredacted versions of the emails discussed in the complaint was also published.

In December 2020, the Associate Dean for Diversity and Inclusion, Associate Vice Provost, and Vice Provost in the Office of Faculty Development and Diversity of Cornell University instructed faculty members to "do something a little out of the ordinary": secure a predetermined "diversity hire" by eliminating open competition entirely. See Exhibit 1. To ensure their "hoped-for diversity hire" was appointed, these administrators implemented a process that inherently discriminated on the basis of race. The plan was straightforward: identify a candidate who met the University's preferred "diversity" criteria and invite them—one at a time—to interview for the role. No other candidates would be solicited, permitted to apply, informed of the available position, or considered, thereby foreclosing any opportunity for merit-based evaluation or equal access to the position. It appears that Cornell leadership was aware of the illegal nature of this hiring practice, as the email concludes with a bold, underlined statement reminding all recipients to keep these matters confidential—which they were, until concerned insiders recently revealed them.

Another email dated December 13, 2022, exposes Cornell's continued use of discriminatory hiring practices. While related to a different position, those emails reveal a continued pattern of discrimination by screening applicants in accordance with the University's preferred race-essentialist viewpoints, and again reminds all recipients of the need for "confidentiality" surrounding the hiring practices discussed therein.

Cornell University deliberately engineered a hiring process designed to yield a race-based outcome. University leadership not only expressed an intent to secure a "diverse" hire as defined by racial criteria but actively developed and implemented a plan to ensure that outcome. Applicants who did not meet the University's race-based preferences were not just systematically excluded—they were not allowed to even know the job opening existed. This was a coordinated and covert scheme to evaluate and select a candidate with University-preferred immutable characteristics, in direct violation of federal anti-discrimination law.

In the internal emails, Cornell leadership repeatedly emphasized the need for secrecy, instructing recipients not to disclose the nature of the hiring process. Such hiring practices are also against the University's policies: "Each opening, unless otherwise exempted in this policy, must be posted on the Working at Cornell website for at least five business days." Cornell Policy No. 6.6.1. (Exhibit 3). I routinely viewed and previously applied to faculty positions posted by Cornell University-- the faculty position open during the 2020-2022 timeframe in Cornell's Ecology and Evolutionary Biology was never posted publicly.

The secrecy surrounding Cornell's hiring process deprived qualified individuals—myself included—of any knowledge that our rights had been violated. This is precisely the type of injustice the doctrine of equitable tolling is designed to remedy. Although Title VII imposes a statutory time limit for filing claims, the Second Circuit, where Cornell is located, has

recognized that such deadlines function as statutes of limitations and are therefore subject to waiver, estoppel, and equitable tolling. *See Knowles v. Postmaster Gen., U.S. Postal Serv.*, 656 F. Supp. 593, 599 (D. Conn. 1987); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Equitable tolling is appropriate where a plaintiff is unaware their rights have been violated due to affirmative acts by the employer to conceal the violation. *Zipes*, 455 U.S. at 393.

That is exactly what occurred here. Cornell officials actively suppressed information about the position and altered the application process to covertly exclude "non-diverse" (i.e., white) candidates. An internal email reveals not only that this exclusion occurred, but that it was enforced through a coordinated effort to keep the process confidential and inaccessible to otherwise qualified applicants.

At the time these discriminatory practices were in effect, I was actively pursuing a faculty position in academia. I earned a Ph.D. in Evolution, Ecology, and Marine Biology from the University of California, Santa Barbara, and recently completed a postdoctoral fellowship at Pennsylvania State University in April 2020 in my field. By that point, I had published 25 peer-reviewed scientific papers, a significantly higher publication rate than many of my peers applying to similar positions at the time. (see Exhibit 2). The faculty position at issue, as described in the internal Cornell emails, fell squarely within my field—Ecology and Evolutionary Biology—and within the window in which I was actively applying to dozens of comparable positions at similarly ranked institutions.

Had Cornell properly publicized the opening, I would have applied. Instead, the position was quietly reserved for a hand-picked "diversity hire" based on racial criteria. Cornell's covert and discriminatory employment practices directly impeded my access to a narrow and highly competitive job market for which I was exceptionally qualified. The harm to my career is not

abstract; it is material, measurable, and the direct result of unlawful conduct. Indeed, I had to change career paths since. This change was not voluntary but compelled by exclusion from a profession I had spent over a decade preparing to enter by racially discriminatory hiring practices.

   Cornell University's actions were not mere policy deviations. They were deliberate violations of federal civil rights law that excluded qualified candidates on the basis of race. The concealed, race-based hiring scheme denied me the opportunity to compete for a position squarely within my expertise and field, at a time when I was actively applying nationwide. Due to Cornell University's explicit efforts to conceal these hiring practices, I was not aware and could not have been aware that my rights were violated. Cornell University's conduct requires accountability.